DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Plaintiff-Appellant Ronald Banks has appealed from an order of the Lorain County Court of Common Pleas that granted summary judgment on his common law intentional tort claim in favor of his employer, Defendant-Appellee Ross Incineration Services, Inc. This Court affirms.
 I.
Ross Incineration Services, Inc. (Ross) operates a commercial hazardous waste treatment and storage facility located in Grafton, Ohio. Before Ross accepts waste of any type, the client must prepare and submit a chemical analysis that describes the toxicity and reactivity of the waste. Once that analysis is received, Ross establishes a customized "handling procedure" and "processing method" for the waste. One service Ross provides is the incineration of chemical waste.
The first stage of the incineration process involves the selection and grouping of various drums containing chemical waste. The selection is based upon the chemical analysis previously submitted. Up to four drums at one time are loaded into large metal racks or "skids." The number of drums per skid is limited by the weight of the loaded drums, their method of packaging, the type of waste and its toxicity and reactivity.
Once the drums are loaded, the "side door operator" must remove the lid from each drum.[1] The skid is then placed on a track and moved into the furnace by the "side door operator" by means of a hydraulic pushing device. The incineration process takes approximately six hours. After incineration, the skid is removed from the furnace and moved by forklift to a cooling area where it remains for approximately three hours.
When the skid has cooled, the empty drums are removed and the skid is inspected for ash and residue. If the skid is clean, it is eligible to be used again and is taken to the side door area. On the other hand, if upon inspection, residue or waste remains, the shift team leader is notified. He or she will then also inspect the skid. Once the shift team leader examines the skid and determines what type of residue exists, an order to re-run the skid empty is given.
On August 12, 1994, Plaintiff was employed by Ross as a "side door operator." That morning, Skid 14 (the Skid) was placed in the furnace carrying a single drum of acid. Six hours later, around noon, when the Skid was removed, it was covered with a black, tar-like acidic residue. In keeping with Ross policy, James Craig (Craig), C-shift team leader, ordered the Skid to be run through again empty. According to company records, C-shift ran the Skid once more. At the end of this shift and after being removed from the furnace, the Skid, nevertheless, remained dirty.
During the shift change, C-shift foreman Thomas Croftcheck informed D-shift foreman Richard McConnell (McConnell) that the Skid had just been removed from the furnace. In addition, Craig informed the D-shift team leader, George Zadigian (Zadigian), that the Skid had residue on it and needed to be run a third time. Craig and Zadigian then examined the Skid together. As a result of their brief inspection, Zadigian determined that, although the Skid contained dangerous, acidic residue, it was not hot.
After Zadigian had completed his other pre-shift duties, he returned to the side door area to find that the Skid had been loaded with four drums, despite the residue and thus, in violation of Ross' policy.[2] A five minute meeting was held among Plaintiff, Zadigian and McConnell. During that meeting, the three men considered their options: (1) remove the drums and spread the acidic residue, or (2) simply run the Skid with the four drums. The fact that the Skid had just been removed from the furnace was never discussed. Zadigian placed his hand on the Skid, but believed it to be warm only because of the heavy steel gauge and the summer heat. In light of the fact that the four drums were also now covered in the acidic residue, and not wanting to create risks by spreading the residue, Zadigian finally ordered Plaintiff to run the Skid.
Plaintiff, fulfilling his duties as the side door operator, proceeded to remove the drum lids. As he opened the drum, he heard a hissing sound. He immediately backed off fearing some type of explosion. After waiting a moment, he returned to the drum and "popped off" the lid. In doing so, he splashed the chemicals inside the drum over himself. Again, he backed away and exclaimed, "Damn, I need to go change." Immediately thereafter, the chemicals on his clothes and person burst into flames.
On July 29, 1996, Plaintiff filed his complaint against Ross alleging a common law intentional tort. Subsequently, on January 23, 1998, Ross moved for summary judgment. Plaintiff filed his brief in opposition on March 2, 1998, to which Ross replied on March 23, 1998.
On May 13, 1998, the Lorain County Court of Common Pleas granted Ross' motion for summary judgment. Plaintiff has appealed, asserting one assignment of error.
 II.
For his assignment of error, Plaintiff has stated,The trial court erred to the substantial prejudice ofPlaintiff-Appellant in granting sumary judgment toDefendant-Appellee.
 A.
This Court observes that upon a motion for summary judgment pursuant to Civ.R. 56(C), where a party seeks summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. The Dresher
court continued,
The moving party cannot discharge its initial burden under
 Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.
Id. at 293. The court then went on to limit the third paragraph of the syllabus of Wing v. Anchor Media, Ltd. of Texas (1991),59 Ohio St.3d 108, to conform to the above requirements. Dresher,75 Ohio St.3d at 295.
These principles were reaffirmed in Vahila v. Hall (1997),77 Ohio St.3d 421, 430:
 As explained in Mitseff (and more recently in Dresher), bare allegations by the moving party are simply not enough. The party seeking summary judgment always bears the initial responsibility of [1] informing the court of the basis for the motion and [2] identifying those portions of the record which support his or her claim. Then, and only then, is the initial burden discharged, requiring the nonmoving party to comply with Civ.R. 56(E).
(Emphasis sic.) Thus, it is apparent that unless the movant fulfills both prongs of the Dresher duty, the motion for summary judgment must be denied. The moving party is required to state the basis for his motion and then point to "pleading[s], depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any" which support the motion. Civ.R. 56(C). Merely alleging that a nonmoving party lacks evidence does not satisfy this obligation. Unless and until that burden is met, the nonmovant is under no corresponding duty, and the motion must be denied. "[A] movant's conclusory assertions of no evidence against the nonmovant [are] no longer good enough in Ohio." Am. Express Travel Related Serv. Co., Inc. v. Mandilakis
(1996), 111 Ohio App.3d 160, 164. Further, assuming the movant satisfies his burden, the nonmovant is then permitted to present or point out evidence that satisfies his reciprocal burden to demonstrate the existence of a material factual dispute.
In reviewing a trial court's ruling on a motion for summary judgment, this Court applies the same standard a trial court is required to apply in the first instance: whether there were any genuine issues of material fact and whether the moving party was entitled to judgment as a matter of law. Parenti v. Goodyear Tire Rubber Co. (1990), 66 Ohio App.3d 826, 829. Because the propriety of a trial court's decision granting summary judgment is a matter of law, an appellate court reviews the matter de novo.Lorain Cty. Bd. of Commrs. v. United States Fire Ins. Co. (1992),81 Ohio App.3d 263, 267.
 B.
Prior to 1982, the protection afforded by workers' compensation laws in Ohio encompassed any injury occurring at the workplace. The Ohio Supreme Court has since recognized that workers' compensation laws were designed to improve the plight of the injured worker, and observed that to hold that intentional torts were included under the Workers' Compensation Act would be tantamount to encouraging such conduct, and clearly not in line with the motivating spirit and purpose of the Act. Blankenship v.Cincinnati Milacron Chemicals (1982), 69 Ohio St.2d 608,614.[3] Brady v. Safety-Kleen Corp. (1991), 61 Ohio St.3d 624, paragraph one of the syllabus. Accord Jones v. V.I.P.Development Co. (1984), 15 Ohio St.3d 90. Affording an employer immunity for its intentional behavior would not promote a safe and injury free work environment, for an employer could commit intentional acts with impunity with the knowledge that, at the very most, his workers' compensation premiums may rise.Blankenship, 69 Ohio St.2d at 615. Thus, an employee is not precluded by the exclusivity provisions of the workers' compensation laws from bringing a common law intentional tort action if he or she can prove the elements of a common law intentional tort by an employer. Id; Trojan v. Ro-Mai Industries,Inc. (August 19, 1998), Summit App. 18778, unreported, at 6.
It is well established that, because an employer's intentional tortious conduct does not arise out of employment, the Ohio Workers' Compensation system does not bestow upon employers immunity from civil liability for their intentional torts.Blankenship, 69 Ohio St.2d at 613. "The workers' compensation system is based on the premise that an employer is protected from a suit for negligence in exchange for compliance with the Workers Compensation Act." Id. at 614. It must be remembered that the compensation scheme was designed to provide less than full compensation for injured employees. Id. Damages such as pain and suffering and loss of consortium are unavailable remedies to the injured employee. Likewise, punitive damages cannot be obtained.Id. at 614-15. In contrast, these damages remain available to individuals who have been injured by intentional tortious conduct of third parties. There is no legitimate reason why an employer should escape from such damages when he has committed an intentional tort against his employee. Id. at 615.
In order to establish intent within the common law meaning of intentional torts by an employer, an employee must demonstrate each of the following:
 (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;
 (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and,
 (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
Fyffe v. Jeno's Inc. (1991), 59 Ohio St.3d 115, paragraph one of the syllabus. Moreover, "to establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established." Id. at paragraph two of the syllabus. The Fyffe court further explained by stating:
 Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent.
Id; see, also, Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, 117. It is this element of substantial certainty which distinguishes a merely negligent act from intentionally tortious conduct. Id. at 116, quotingJones, 15 Ohio St.3d at paragraph one of the syllabus.
The distinction between negligence, recklessness and substantial certainty is a matter of degree. Van Fossen,36 Ohio St.3d at 115, quoting Prosser Keeton, in Law of Torts (5 Ed. 1984) 36, Section 8. The line must be drawn where "the known danger ceases to be only a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the actor a substantial certainty." Id. In passing on motions for summary judgment, courts must demand intentional tortious conduct from which harm to the employee is "a virtual certainty." Id. at 116.
 C.
In the instant appeal, Plaintiff has averred that the trial court erred to his substantial prejudice when it granted summary judgment in favor of Ross. Plaintiff contends that genuine issues of material fact exist as to each prong of the Fyffe analysis. This Court disagrees.
The Fyffe test requires a plaintiff to establish each of its three elements before he or she will be entitled to recover. Assuming, without deciding, that Plaintiff is correct in his position concerning the first and third prongs, if he cannot establish his harm was a substantial certainty, as a matter of law, summary judgment in favor of Ross would be proper.
As with most tort cases involving the issue of intent, this Court proceeds on a case-by-case analysis and considers the totality of the circumstances. Church v. Rondy Co., Inc. (June 11, 1997), Summit App. No. 18037, unreported, at 7. In the past, this Court has held that the relevant facts and circumstances which establish substantial certainty include, but are not limited to prior accidents of a similar nature, the employer's concealment or misrepresentations concerning the danger, federal and/or state safety violations and noncompliance by employer with industry safety standards. Id. at 7-8.
In this case, Plaintiff's allegations and evidence fail to persuade this Court that any genuine issue of material fact exists as to the second prong of Fyffe. While it may be true that dangers generally exist in the treatment of hazardous wastes by incineration, the record does not establish that Ross had knowledge that once Plaintiff was ordered to re-run the Skid, harm to him was a substantial certainty. In order to satisfy its evidentiary burden on this prong of the Fyffe test, Ross has pointed to evidence in the record that indicates a tragedy of this type had never occurred prior to the Plaintiff's injury. In fact, the record is void of any evidence showing Ross ever had any accident involving re-run skids. Plaintiff even admitted in his deposition that he had processed drums in a re-run skid without incident. Once Ross demonstrated that it had satisfied its burden under Dresher, the burden then shifted to Plaintiff to demonstrate a genuine issue of material fact on the second prong of the Fyffe
test.
Plaintiff has argued that various Ross employees acknowledged the existence of danger in the event that safety procedures were not followed. The deposition testimony of several Ross employees reveals only that an "eruption" of chemicals "could" or "may" result should a drum be placed on an unclean skid or one that had just exited the furnace. Legally, this is not to say a single employee or witness ever stated that such a harm was substantially certain. In fact, Plaintiff's witnesses all employ language like "would probably," "could be dangerous," "could result in an eruption," and "may result in an explosion." As a matter of law, such probabilities and statements do not rise to the level of substantial certainty as defined in Fyffe.
Plaintiff has asserted that because his task as a side door operator was inherently dangerous, his harm was a substantial certainty. While a court must examine the conduct of the employer, it must also consider the context in which the conduct takes place. Danger is commonplace in manufacturing and industry. It is axiomatic that danger exists in chemical waste incineration. Yet, as the Ohio Supreme Court noted in Van Fossen, there are many acts within the manufacturing or industrial process which involve the existence of dangers, where the management fails to take corrective action, institute safety measures or properly warn the employees of the risks about them. Id., 36 Ohio St.3d at 117. These, as a matter of law, are characterized as negligence or wantonness on the part of the employer. See id. A dangerous work environment alone does not establish that one's injury was a substantial certainty. As unfortunate as Plaintiff's circumstances are, his injuries are not beyond that which the General Assembly would have contemplated as entitling him to workers' compensation. In the end, Plaintiff's evidence regarding the second prong of Fyffe is insufficient as a matter of law and does not demonstrate knowledge by Ross to a "substantial certainty" that Plaintiff would be harmed.
The undisputed facts surrounding Plaintiff's injury demonstrate that Ross had no expectation or knowledge that the injury was a substantial certainty. The mere knowledge and appreciation of a risk is not intent. Van Fossen,36 Ohio St.3d at 117. In construing all the facts presented, and all such facts being construed most strongly in favor of the non-moving party, this Court believes that reasonable minds could not differ concerning whether Ross had knowledge that, given the circumstances that evening, harm was "substantially certain" to befall Plaintiff. This Court concludes that no genuine issues of material fact existed, and that Ross was entitled to summary judgment as a matter of law. Accordingly, Plaintiff's assignment of error is without merit.
 III.
Plaintiff's sole assignment of error is overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
 KK The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 BETH WHITMORE FOR THE COURT SLABY, P.J.
 CONCURS
[1] Drums are categorized into three different groups: standard, late opener and punch. If the act of opening the drum poses a serious danger to the "side door operator" due to its toxicity and volatility, it is classified as a "punch drum." The lids to punch drums are punched open by a hydraulic device, not by hand. Neither standard nor late opener drums pose the same risk and need not be opened from a remote location. Instead, their lids are removed by hand.
[2] Neither Zadigian nor McConnell ordered the drums to be loaded on the Skid. However, the four drums were scheduled to be run that evening.
[3] In response to the Ohio Supreme Court's holding inBlankenship, the General Assembly enacted R.C. 4121.80
(Am.Sub.S.B. No. 307, 141 Ohio Laws, Part I, 733-37), thereby superceding its holding. However, in Brady v. Safety-Kleen Corp.
(1991), 61 Ohio St.3d 624, the Ohio Supreme Court invalidated R.C.4121.80 in its entirety. In an attempt to once again supercede the law stated in Blankenship and Brady, the General Assembly enacted R.C. 2745.01. On April 14, 1999, the Ohio Supreme Court held R.C.2745.01 unconstitutional. Johnson v. B.P. Chemicals, Inc. (1999),85 Ohio St.3d 298, 308. As such, the common law rules set forth in Blankenship and its progeny control.